IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

McDOWELL BUILDING, LLC,       *

     Plaintiff,              *

        v.                *       Civil Action No. RDB-12-2876

ZURICH AMERICAN INSURANCE CO.,  *

     Defendant.           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

In this diversity action, Plaintiff McDowell Building, LLC ("McDowell Building") has sued Zurich American Insurance Co. ("Zurich American") for breach of an architect's malpractice insurance policy. McDowell Building alleges that it was harmed by the negligence of its architect, and that Zurich wrongfully denied coverage under the policy. Pending before this Court are the parties' cross-motions for summary judgment. The parties' submissions have been reviewed, and this Court held a hearing on March 24, 2015. For the reasons that follow, Defendant Zurich American Insurance Co.'s Motion for Summary Judgment (ECF No. 29) and Plaintiff McDowell Building, LLC's Cross-Motion for Summary Judgment (ECF No. 31) are DENIED.[1]

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550

---

[1] Additionally, McDowell Building, LLC has filed a Motion for Leave to File the Declaration of R. Michael Smith, Esq., for Consideration on Cross-Motions for Summary Judgment (ECF No. 38), which will be GRANTED for the reasons stated herein.

U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

## I.      Origins of Dispute

Plaintiff McDowell Building, LLC ("McDowell Building") is a real estate developer involved in a project known as the "McDowell Building," located in the Mt. Vernon neighborhood of Baltimore, Maryland.  By spring of 2003, McDowell Building included the following members: D. Ronald Brasher, John Day II, John Day III, Kemp Byrnes, and Frank Zokaites.  As part of the development plan, the members of McDowell Building hoped to obtain state and federal tax credits.[2]

On October 31, 2002, the accounting firm Reznick Fedder & Silverman (the Reznick Firm) wrote a letter to one of the McDowell Building members indicating that the project had received Part II approval from the Maryland Historical Trust and noting that the project should be eligible for a tax credit provided it met the other criteria.  *See* Def.'s Mem. Supp. Mot. Summ. J. Ex 1, ECF No. 29-2.  McDowell Building relied upon this letter when deciding to purchase the property.

McDowell Building hired DR Brasher, Inc., d/b/a Brasher Design, ("Brasher Design") to complete the applications necessary for obtaining the required credits.  Karen Starika, an employee of Brasher Design, was tasked with preparing and filing the

---

[2] The basic framework of the Maryland tax credit program is laid out in § 5A-303 of the State Finance & Procurement Article of the Maryland Code; that statute, however, also authorizes the State to fashion implementing regulations as part of the Code of Maryland Regulations.  As explained in those regulations, an individual seeking to obtain the tax credit must go through a three-step application process.  First, the applicant must obtain a certification that the building is a "Certified Historic Structure" (Part I).  *See* COMAR 34.04.07.03.  Second, the applicant must submit plans for the rehabilitation work on the structure (Part II).  *See* COMAR 34.04.07.04.  Finally, the applicant must apply to have the work certified after the project is completed (Part III).  *See* COMAR 34.04.07.05.

applications.

By September 23, 2004, Brasher Design had discovered that the Maryland Historical Trust had no application for the McDowell Building project on file. *See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 5, ECF No. 29-6 (internal Brasher Design email). The Maryland Historical Trust further declared that it was now too late for McDowell Building to apply for the tax credit. Ronald Brasher contends that, at that time, his firm conducted an investigation and concluded that the applications had been submitted and that he and his firm had made no error. *See* Brasher Aff. ¶ 10, Mem. Supp. Cross-Mot. Summ. J. Ex. 1, ECF No. 34-1.

Ronald Brasher ultimately informed the other members of McDowell Building about the issue with the tax credit application. Thereafter, the record indicates there was at least some discussion of the potential liabilities of various parties. Specifically, Kemp Byrnes, one of the other McDowell Building members, sent an email on May 20, 2005 to Ronald Brasher and the other members, that stated, in part: "I would rather spend my legal money pursuing you and let you and your attorney try to recoup some of your damages from the State and Reznick." Def.'s Mem. Supp. Mot. Summ. J. Ex. 4. Similarly, on June 6, 2005, John Day sent a letter to the other members stating that "[t]he partnership also faces other issues which will cause significant stress and possibly money to the members[,] . . . . [including] potential lawsuits between the Company, John E. Day Associates, and Brasher Design as well as possible suits between the actual individual partners." Def.'s Mem. Supp. Mot. Summ. J. Ex. 6.

Despite these communications, McDowell Building brought suit against the Maryland

Historical Trust on October 28, 2005 in the Circuit Court for Baltimore City, seeking a writ of mandamus and a declaratory judgment forcing the Maryland Historical Trust to process McDowell Building's Maryland tax credit application. The suit also sought damages from the Reznick Firm for professional negligence because McDowell Building had relied on the letter from the Reznick Firm in deciding to purchase the property.

On June 27, 2006, however, Frank Zokaites, an individual member of McDowell Building, filed a cross-claim and third party complaint (the "Zokaites Complaint") against Brasher Design on behalf of himself and McDowell Building. The Zokaites Complaint included a professional negligence claim against Brasher Design, which was contingent upon the state court finding that no tax credit application had been filed. The court severed the Zokaites Complaint and stayed it pending resolution of McDowell Building's suit against the Maryland Historical Trust.

## II.    Relevant Policy Language

Brasher Design was covered by a series of consecutive one-year Architects and Engineers Professional Liability insurance policies from the time of initial discovery of the tax credit problem in September 2004 to the commencement of the suit against Brasher Design in June 2006. Brasher Design's original policy with Zurich, the 2004-05 Policy, was effective July 6, 2004 to July 6, 2005, while its 2005-06 Policy was effective July 6, 2005 to July 6, 2006. The final policy covered Brasher Design from July 6, 2008 to July 6, 2009. The relevant terms of the 2005-06 and the 2004-05 policies are essentially identical unless otherwise noted.

The first line of the 2005-06 Policy states that "THIS POLICY PROVIDES

CLAIMS-MADE AND REPORTED COVERAGE." Similarly, the 2005-06 Policy defines the terms of coverage accordingly:

> We will pay on behalf of the "Insured" all sums in excess of the Deductible noted in Item 6, of the Declarations that you are legally obligated to pay as "Damages" because of "Claims" first made against you during the "Policy Period" and reported to us during the "Policy Period," or the Extended "Claims" Reporting Period if applicable, provided that:
> A. the "Claim" arises out of an actual or alleged negligent act, error or omission with respect to "Professional Services" rendered or that should have been rendered by you or any entity for whom you are legally responsible, including your interest in joint ventures;
> B. the act, error, or omission took place during the "Policy Period" or on or after the "Retroactive Date" specified in the Declarations;
> C. prior to the effective date of this policy you or any 'Insured' had no knowledge of any 'claim' or circumstances, involving an act, error, or omission, which may result in a 'claim' under this policy;[3]
> D. all "Claims" made against you are made during the "Policy Period"; and
> E. you give prompt notice of a "Claim", but not later than 60 days after expiration or termination of this policy, in accordance with the Notice of Claims conditions of this policy.

The term "Claim" is defined as "any demand received by you seeking 'Damages' or 'Professional Services' and alleging liability or responsibility on your part." Finally, the section "Claim Provisions" provides that "[w]ritten notice must be provided to [Zurich] no later than 60 days after the expiration or termination of the policy."

---

[3] This provision was added to the 2005-06 Policy by an endorsement, referred to by the parties as the Prior Claims or Circumstances Endorsement. The Endorsement replaced the language from the 2004-05 Policy, which read: "prior to the effective date of the first policy issued to you and continuously renewed by us, no principal, partner, director or officer of yours had knowledge of any circumstance that could reasonably be expected to result in a 'Claim.'"

### III.    Later Developments in Lawsuits

On May 21, 2009, the Reznick Firm filed a cross-claim against Brasher Design for indemnity and contribution.   Gordon Feinblatt, the firm representing Brasher Design, contacted Zurich American in June 2009.   It appears the precise information conveyed to Zurich at this time is somewhat in dispute.[4]   On September 28, 2009, a settlement was made for the claims involving the Reznick Firm: the Reznick Firm paid $275,000 to McDowell Building and its members; the Reznick Firm released its cross-claim against Brasher Design for $0; McDowell Building, its members, and Brasher Design released the Reznick Firm; and all claims to which the Reznick Firm was a party were dismissed with prejudice. Neither the Reznick Firm nor Brasher Design admitted any liability.

McDowell Building's case against the Maryland Historical Trust proceeded to trial in September of 2010, and the state court found that McDowell Building had failed to carry its burden in proving that the tax credit application had in fact been filed.   Brasher Design applied to Zurich American at this point to request coverage under the Policies, but Zurich again denied the claim.[5]

On June 1, 2010, Brasher Design and McDowell Building settled the claims in the Zokaites Complaint.   Under the terms of the settlement agreement, the parties agreed that

---

[4] McDowell Building asserts that Zurich was informed of the Zokaites Complaint.  Zurich argues that it was not informed until November 2009.  Notably, McDowell Building's original Complaint in this action alleged that Brasher Design's attorneys first notified Zurich of the Zokaites Complaint in November of 2009.  *See* Compl. ¶ 14.  These issues are significant to McDowell Building's Motion for Leave to File the Declaration of R. Michael Smith, Esq., for Consideration on Cross-Motions for Summary Judgment (ECF No. 38), as Mr. Smith's two declarations suggest that Zurich American was informed about the Zokaites Complaint.

[5] In fact, Brasher Design had previously requested coverage under the Polices; Zurich had declined coverage by letter dated February 17, 2010.

McDowell Building's loss due to Brasher Design's failure to file the application was $625,000 plus interest at the legal rate from April 2, 2005.  In addition, Brasher Design assigned all claims against Zurich to McDowell Building.

After the settlement between McDowell Building and Brasher Design, McDowell Building instituted suit asserting its subrogated rights against Zurich in the Circuit Court for Baltimore City, Maryland on August 1, 2012.  Zurich removed to this Court on September 26, 2012 based on diversity of citizenship under 28 U.S.C § 1332.  McDowell Building's Complaint (ECF No. 2) contained two counts.  The first count alleged a breach of contract claim premised upon a duty to indemnify, for which McDowell Building seeks "$625,000, plus interest at the legal rate from April 2, 2005, costs, and attorney's fees."  The second count alleged a breach of contract claim premised on a duty to defend, for which McDowell Building seeks "an amount greater than $25,000, plus interest, expenses, and attorney's fees."

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.

7

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

When both parties file motions for summary judgment, as here, the court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert denied*, 540 U.S. 822 (2003); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Wright & Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

<u>ANALYSIS</u>

In this hotly contested case, both parties have moved for summary judgment. Zurich American asserts that the applicable policy is the 2005-06 Policy. In Zurich American's view, coverage is barred under this Policy due to a provision—the Prior Claims or

Circumstances Endorsement—which excludes coverage where the insured knew of circumstances that might have given rise to a later claim against the insured.  In opposition, McDowell Building argues that Brasher Design was covered because the employees of Brasher Design subjectively believed that Brasher Design would not be subject to suit. Alternatively, McDowell Building argues that the Zurich American must cover the claim under the 2004-05 Policy.  The next dispute is whether McDowell Building would have been able to take advantage of the Maryland Rehabilitation Tax Credit in light of the facts in this case and regardless of Brasher Design's negligence.  The parties also reiterate their earlier arguments concerning § 19-110 of the Insurance Article of the Maryland Code, which requires insurers to prove that prejudice to the companies' interests before denying a claim based upon late notice to the company.  Finally, the parties dispute whether Zurich American has demonstrated any prejudice under § 19-110 justifying Zurich American's denial of coverage.

## I.  Prior Claims or Circumstances Endorsement

Zurich American first argues that coverage is barred—regardless of whether it was prejudiced by the late notice of the Zokaites Complaint—due to the Prior Claims or Circumstances Endorsement in the 2005-06 Policy.  The 2005-06 Policy states the terms of coverage accordingly:

> We will pay on behalf of the "Insured" all sums in excess of the Deductible . . . that you are legally obligated to pay as "Damages" because of "Claims" . . . provided that:
>
> . . .
>
> C. prior to the effective date of this policy you or any 'Insured' had no knowledge of any 'claim' or

> circumstances, involving an act, error, or omission,
> which may result in a 'claim' under this policy;

Zurich American argues that this provision of the 2005-06 Policy bars coverage for the Zokaites Complaint. Specifically, Zurich American argues that similar "no prior knowledge" provisions have been interpreted to create an objective standard. It is Zurich American's position that Brasher Design was well aware of the possibility of suit against it, as allegedly evidenced by an internal email between Brasher Design employees and two documents authored by McDowell Building members suggesting that future legal actions against Brasher Design might be possible.

Meanwhile, McDowell Building argues that the Prior Claims or Circumstances Endorsement creates a subjective standard for knowledge. Specifically, McDowell Building points out that Zurich American changed the language of the knowledge provision, eliminating the phrase "circumstances that could reasonably be expected to result in a 'Claim'" and replacing it with the current language of "circumstances, involving an act, error or omission, which may result in a 'claim.'"

In asserting that the Prior Claim or Circumstance Endorsement should be interpreted to include an objective standard, Zurich American points to four cases that it views as supporting the proposition that Maryland law favors the objective standard; specifically, Zurich American cites *Continental Casualty Co. v. Conroy, Ballman & Dameron, Chtd.*, 2006 WL 6638925 (D. Md. 2006), *Westport Ins. Corp. v. Albert*, 208 F. App'x 222 (4th Cir. 2006), *Maynard v. Westport Ins. Corp.*, 208 F. Supp. 2d 568 (D. Md. 2002), and *Culver v. Continental Ins. Co.*, 1 F. Supp. 545 (D. Md. 1998). An examination of these cases reveals, however, that

they are not directly on point.[6]  Each of the cited cases involved policies with clear language invoking an objective standard through words such as "reasonable" or "foreseeable." *Continental Casualty Co.*, 2006 WL 6638925, at *2 ("basis to believe [that act or omission] . . . might reasonably be expected"); *Albert*, 208 F. App'x at 224 ("knew or could have reasonably foreseen"); *Maynard*, 208 F. Supp. 2d at 571 ("knew or could have reasonably foreseen"); and *Culver v. Continental Ins. Co.*, 1 F. Supp. at 546 ("no reasonable basis to believe that Insured had breached a professional duty or to foresee that a Claim would be made"). The words "reasonable" or "foreseeable" clearly implicate an objective standard.   Moreover, the noticeable absence of such words in the Prior Claims or Circumstances Endorsement is telling; the language of the Policy merely requires that the insured have "no knowledge of any . . . circumstances, involving an act, error, or omission, which may result in a 'claim.'" The Policy language lacks the obvious talismans of an objective standard.   Additionally, the scope of the provision is circumscribed by the limiting phrase "which may result in a 'claim'"; thus, the provision only applies if Brasher Design had knowledge of an error that

---

[6] Indeed, each of the polices included language that is somewhat similar to the applicable language in this case.  *See Continental Casualty Co.*, 2006 WL 6638925, at *2 (Coverage excluded if any insured "had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a claim."); *Albert*, 208 F. App'x at 224 (Prior knowledge exclusion excluded coverage for "any act, error, omission, circumstance, or 'personal injury' occurring prior to the effective date of this 'policy' if any insured at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or "personal injury" might be the basis of a 'claim.'"); *Maynard*, 208 F. Supp. 2d at 571 (Exclusion applied when claim arose out of "[a]ny act, error, omission, circumstance or PERSONAL INJURY occurring prior to the effective date of this POLICY if an INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a CLAIM."); and *Culver v. Continental Ins. Co.*, 1 F. Supp. at 546 (Claims covered only if "[t]he Named Insured . . . had no reasonable basis to believe that Insured had breached a professional duty or to foresee that a Claim would be made against the Insured."). However, as explained below, the language of foreseeability or reasonableness is the key distinction.

might have resulted in a demand for damages against it.  Accordingly, this Court finds that

the clear language of the Policy creates a subjective knowledge standard.[7]

---

[7] While certainly not controlling, this Court finds the reasoning of *Selko v. Home Insurance Co.*, 139 F.3d 146, 151-52 (3d Cir. 1998), to be persuasive.  In that case, which was brought by an individual whose attorney was alleged to have negligently handled the proceeds of his personal injury case, the United States Court of Appeals for the Third Circuit examined the language contained in a professional malpractice policy:

> [The plaintiff] would construe the language "provided ... the insured had no basis to believe that the insured had breached a professional duty" as if it were written, "provided ... the insured neither knew nor believed that the insured had breached a professional duty."  There is, however, a significant difference in meaning between these two formulations. The latter wording, had it been incorporated into the policy, would, indeed, have indicated that the insured's own knowledge and belief were the touchstones. But the actual policy language is different. Its phraseology-that "the insured *had* [no basis to believe]"-refers, it is true, to the factual predicate possessed by the insured. But it measures that predicate by the impersonal standard of a "basis to believe," not by what the insured knew or believed. Had the provision been meant to stand or fall on the individual insured's subjective assessment of the known facts, it could easily have used the words "knew" or "believed," as indicated above. Instead, by using the words "basis to believe," the policy pointed to an objective criterion.
>
> Hence, we agree with [*Home Insurance Co. v.*] *Stegenga*, [No. 90-275 (W.D. Pa. July 3, 1991), *aff'd* (3d. Cir. Feb. 3, 1992)] that the plain language of the exclusion calls for a two-stage analysis. First, it must be shown that the insured knew of certain facts. Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a "basis to believe," it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty. That the insured denies recognizing such a basis on grounds of ignorance of the law, oversight, psychological difficulties, or other personal reasons is immaterial.

*Selko v. Home Ins. Co.*, 139 F.3d 146, 151-52 (3d Cir. 1998) (footnotes omitted).  As should be apparent, the Policy in this case simply invokes the words "no knowledge of" and contains none of the other indicators of an objective standard.

While this Court sees fit to rule on the clear meaning of the language of the Policy, it notes that its conclusion would be identical if it had found the language was ambiguous.  Under Maryland law, insurance contracts are interpreted like other contracts; however, if the policy language is ambiguous, then the language "will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument*."[7]  *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556 (Md. 2001) (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97-98 (Md. Ct. Spec. App. 1997)).  Here, Zurich American drafted the language, and in fact, modified the provision to *remove* the phrase "could reasonably be expected"—i.e., clear language signifying an objective standard.  Thus, under Maryland's basic principles of insurance contract interpretation, this Court would have no choice but to construe the language against Zurich American.

In this case, there is no question that Mr. Brasher and Brasher Design had some knowledge of the facts that ultimately gave rise to its liability to McDowell Building.[8]  As explained above, however, this fact does not end this Court's inquiry; even if Brasher Design was aware of an error made by its employees, the provision would not act to exclude coverage where Brasher Design had been assured that it would not be subject to suit. Indeed, Ronald Brasher asserts that, after discovering that the Maryland Historical Trust did not have the application on file, his firm conducted an investigation, and his firm concluded that both applications had in fact been filed with the Maryland Historical Trust.  Pl.'s Ex. A ¶ 10.  Additionally, Brasher contends that the members of McDowell Building commonly discussed their respective liabilities and that he "remained certain that [the other members] would not actually make a claim against [him] or Brasher Design." Pl.'s Ex. A ¶ 12.  Thus, Brasher has suggested both that there was no factual basis for a claim against him and that, even if such a claim had existed, the other members of McDowell Building had assured him that the company would not attempt to hold Brasher Design liable.[9]  At this stage of the litigation, Mr. Brasher's affidavit is sufficient to avoid summary judgment against McDowell

---

[8] Specifically, emails between Brasher Design employees indicate that Brasher Design realized that the Maryland Historical Trust did not have the state tax credit application on file by at least September 23, 2004.  After Brasher Design notified the McDowell Building members of the problem, McDowell Building member Kemp Byrnes sent an email to Mr. Brasher and the other members on May 20, 2005, suggesting that he "would rather spend [his] legal money pursuing [Mr. Brasher] and let [Mr. Brasher] try to recoup some of [his] damages from the State and Reznick." Def.'s Mem. Supp. Mot. Summ. J. Ex. 4.  Similarly, on June 6, 2005, John Day sent a letter to the other members stating that "[t]he partnership also faces other issues which will cause significant stress and possibly money to the members[,] . . . . [including] potential lawsuits between the Company, John E. Day Associates, and Brasher Design as well as possible suits between the actual individual partners." Def's Mem. Supp. Mot. Summ. J. Ex. 6.

[9] This Court notes that neither party has directly attacked the state court's conclusions in the case against the Maryland Historical Trust, nor has any party made any arguments about the preclusive effects, if any, of that ruling.

Building.  On the other hand, summary judgment in favor of McDowell Building would also be inappropriate in light of the communications from the other members of McDowell Building implying that Brasher Design could be subject to suit.

While this Court has construed the Policy to require subjective knowledge on the part of Brasher Design, the record on this question at trial should not—and will not—be limited solely to Donald Brasher's statements regarding his understanding of potential suits against him and his firm.   In this Court's view, there are factual disputes even regarding Mr. Brasher's subjective understanding of the potentiality of suits; specifically, external evidence of the communications between the members may shed light on the partners' communications and could potentially discredit Mr. Brasher's assertion that he remained certain he would not be subject to suit.

## II.    Coverage under the 2004-05 Policy

McDowell Building has alternatively argued that it is covered under the 2004-05 Policy and, therefore, Zurich American is liable even if the Prior Claims or Circumstance Endorsement bars coverage under the 2005-06 Policy.  Specifically, McDowell Building argues:

> In addition, Zurich's theory that it can deny coverage because Brasher Design learned of the tax credit situation on September 23, 2004 (*i.e.*, before the 2005-06 Policy went into effect) is meritless because Brasher Design already was covered by the 2004-05 Policy at that time. The 2004-05 Policy included a "Notice of Circumstance" provision that provided coverage if Brasher Design learned of a circumstance that may result in a claim and notified Zurich during the 2004-05 Policy period, even if a claim was not filed against Brasher Design until after the 2004-05 Policy had ended. The Notice of Circumstance provision said:
> > If during the "Policy Period" [*i.e.*, July 6, 2004 – July 6, 2005] you become aware of a circumstance from which a "Claim" is

reasonably anticipated, and if during the "Policy Period" you give notice to us of:

1. the act error or omission

2. the "Damages" which have or may result from such act, error or omission; and

3. how and when you first became aware of such act, error or omission, then any "Claim", for which coverage is provided by this policy, that may be made against you arising out of such act, error or omission shall be deemed for purposes of this insurance to have been made on the date on which the notice was given to us.

(2004-05 Policy at Zurich 277.)

Brasher Design's renewal application, which was completed on May 17, 2005, instructed Brasher Design to give notice of any "circumstance" that may result in a claim. The application asked:

28) Is your firm . . . aware of any circumstances, incidents, situations or accidents during the past ten years which may result in a claim being made against your Firm . . . ? . . .

If "YES," please provide details on a separate sheet.

(2004-05 Policy at Zurich 295.) Brasher Design answered "no" to this question and did not provide information about the Maryland tax credit problem. 1 But Zurich admits that the information it asked Brasher Design to provide in this renewal application also would have constituted a "notice of circumstance" under the 2004-05 Policy. In deposition, Zurich's representative testified:

Q. Now, the information that is supposed to be submitted in response to or with a "yes" on question 28 is essentially the same information that [Mr. Brasher] would have been providing on a Notice of Circumstance to Zurich. Isn't it?

A. Yes.

Q. So is it fair to say that if he had disclosed the circumstance involving the tax credit with his renewal application May 17, 2005, he would also have been complying with the notice of circumstance provision in your policies?

A. Yes.

(Depo Cecere at 17.) In other words, Zurich admits that Brasher Design would have been covered by the 2004-05 Policy but for the fact that Brasher Design failed to give a timely notice of circumstance, which Zurich says Brasher Design should have done at the time of the renewal application. Thus, Section 19-110 of the Insurance Article of the Maryland Code applies, and Zurich cannot deny coverage unless it proves that it suffered "actual prejudice" by Brasher Design's failure to give a timely notice of circumstance.

In the Memorandum Opinion denying Zurich's Motion to Dismiss, this Court analyzed in detail Section 19-110. (ECF 12.) The Court explained

that Section 19-110 "prevents the forfeiture that occurs when an individual pays for an insurance policy but is denied coverage on procedural grounds," including failure to give timely notice. (Mem. Op. at 8 (ECF 12).) Here, there is no dispute that Brasher Design paid Zurich in full for the 2004-05 Policy. Moreover, there is no dispute that the 2004-05 Policy was in force when Brasher Design first learned, on September 23, 2004, of the circumstances surrounding the tax credit problem. Accordingly, Section 19-110 prevents Zurich from denying coverage unless Zurich can show it suffered actual prejudice by not receiving a timely notice of circumstance, which Zurich has failed to do in this case.

Pl.'s Mem. Supp. Cross-Mot. Summ. J. at 11-14, ECF No. 30 (footnotes omitted).

As is clear from the passage quoted above, McDowell Building's argument—seeking application of § 19-110 to the Notice of Circumstance provision—is unsupported by any case law.  Moreover, this Court sees no reason to rule for such a dramatic extension of liability for insurers—one that could essentially convert claims-made and/or claims-made-and-reported policies into hybrid policies covering both traditional "occurrences," such as an insured's errors and omissions themselves, *and* claims against the insured. Such an extension clearly conflicts with the basic terms of the 2004-05 Policy, which states that it is a claims-made-and-reported policy and which defines coverage in terms of "claims," meaning "any demand received by [the insured] seeking 'Damages' or 'Professional Services.'"  As the "claim" in this case was not made until after the expiration of the 2004-05 Policy, Zurich American could properly deny coverage under *T.H.E. Insurance Co. v. P.T.P., Inc.*, 331 Md. 406, 628 A.2d 223 (1993) (holding that the predecessor of § 19-110 did not apply in case where policy expired before a claim was made against the insured regardless of the fact that the accident giving rise to the claim occurred during the duration of the policy). Accordingly, there would be no coverage under the 2004-05 Policy.

### III.    Availability of Maryland Rehabilitation Tax Credits

Zurich American next argues that that McDowell Building would not have been able to take advantage of the tax credit regardless of Brasher Design's alleged negligence. Specifically, Zurich American asserts that the actual work on the project was completed in December 2004 when the City of Baltimore issued the Certificate of Occupancy.[10]  Zurich American argues that, because Maryland law requires an amended tax return to be filed within three years, McDowell Building could never have recovered the state credit because the federal tax credit was not approved until February 2009—more than three years after the issuance of the Certificate of Occupancy in December 2004.

The tax credit program at issue in this case is codified at § 5A-303 of the State Finance & Procurement Article of the Maryland Code.  Specifically, § 5A-303 provides that "the credit . . . may be claimed for the year a certified rehabilitation is completed, only if the Director has, by the time the return is filed, issued a certificate of completion for the certified rehabilitation."  Md. Code, Fin. & Proc., §5A-303(g)(4)(i) (2014).  If a project is not approved until after the tax return was filed, "[a] taxpayer claiming the credit may amend a return for the year the certified rehabilitation was completed to account for a certificate issued subsequent to the filing of the original return."  *Id.* §5A-303(g)(4)(ii).  However, the amended return must "be filed within the period allowed under the Tax – Gen. Article for filing refund claims."  *Id.* §5A-303(g)(4)(iii).

The main dispute between the parties appears to center upon the construction of the word "completed."  The term is not defined in the statute, and no court has previously

---

[10] A Certificate of Occupancy indicates that a building has complied with the requirements of the Baltimore City Building Code and is ready for occupancy.

construed the term in the context of § 5A-303.  Zurich American asserts that the building was "available for its intended use" upon the issuance of the Certificate of Occupancy and was, therefore, completed at that point.  Def.'s Reply 13, ECF No. 35.  McDowell Building, however, points out that the statute's reference to completion is connected to rehabilitation work and further asserts that the date of issuance of the Certificate of Occupancy is irrelevant for purposes of the Rehabilitation Tax Credit.

After reviewing the parties' submissions and the statutory structure of the Rehabilitation Tax Credit program, this Court finds that the term "completed" clearly refers to the completion of rehabilitation work.[11]  The issuance of a Certificate of Occupancy has

---

[11] Zurich American also argued that the statutory structure of § 5A-303 cuts in its favor. Specifically, Zurich American argues:

> Although it is unnecessary to look beyond the plain and unambiguous language of §5A-303, review of the statutory structure of §5A-303 further supports Zurich's interpretation of "completed" and confirms the legislative intent. This Court may look to statutory structure to further understand the legislative intent. *Id.* at 48 (citations omitted). As the Maryland Court of Appeals has explained, "we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Id.*
>
> Two provisions of §5A-303 help inform the proper interpretation of "completed" in the context of the statute. Md. Code, Fin. & Proc., §5A-303(g)(4)(ii) (2014) contemplates a situation where a project is approved for tax credits after the return for the year the project was completed was filed. Md. Code, Fin. & Proc., §5A-303(g)(4)(i) (2014) contemplates a scenario where a project is approved for tax credits before the return for year the project was completed is filed. This Court may look to statutory structure to further understand the legislative intent. *Id.* at 48 (citations omitted). As the Maryland Court of Appeals has explained, "we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Id.* If "completed" means the date the project met the NPS's requirements, then there is no need for these two statutory provisions. A project would not be deemed completed until it receives certification. Therefore, there would be no situation where a project would receive certification after the return for the year the project was completed was filed. The Court should harmonize these two provisions so that they each may be given effect. McDowell's definition of "completed" ignores the statutory structure, frustrates the legislative intent, and essentially invalidates these provisions.

nothing to do with the Rehabilitation Tax Credit Program, and the record is clear that the rehabilitation work was ongoing in 2005.   Accordingly, summary judgment in Zurich American's favor would be inappropriate because McDowell Building could have taken advantage of the tax credit within the parameters of the Rehabilitation Tax Credit program and Maryland tax law.[12]

## IV.   Applicability of § 19-110 of the Insurance Article of the Maryland Code

At the motion to dismiss stage, this Court found that McDowell Building had satisfied its burden of demonstrating that § 19-110 of the Insurance Article of the Maryland Code applied to the Policy at issue in this case.   In reaching that conclusion, this Court examined the Policy language in light of the controlling interpretation of Maryland law as stated in *Sherwood Brands, Inc. v. Great American Insurance Co.*, 418 Md. 300, 13 A.3d 1268 (2011).   While this case has now proceeded to the summary judgment stage, there is nothing new in the record that favors revisiting this Court's earlier determination that § 19-110 applies to the Policies at issue in this case.   In fact, Judge Hollander of this Court has since cited favorably to this Court's earlier decision in this case and, after independently reviewing

---

Def's Reply 13-14, ECF No. 35 (footnotes omitted).  This argument holds little water as it conflates the final certification and approval by the National Park Service and/or the Maryland Historical Trust with the completion of the physical rehabilitation work on the structure.

[12] Zurich American and McDowell Building have also briefed the issue of waiver. Specifically, McDowell Building argued that, by refusing to participate in the settlement negotiations with respect to the Zokaites Complaint, Zurich American waived its opportunity to contest the amount of loss caused by Brasher Design's alleged negligence, which McDowell Building assesses as $700,000.  Zurich American argues that it is entitled to dispute the $700,000 figure because the settlement of the original claims included a payment of only $250,000 and moreover, the law permits it to dispute the reasonableness of the settlement.  In light of this Court's conclusions with respect to the other issues, this Court makes no ruling on the issue of waiver with respect to the amount of recovery, and this Court will address this issue if and when the need arises to determine McDowell Building's damages.

the relevant case law, came to the same conclusion—i.e., that § 19-110 applies to claims-made-and-reported policies because Maryland law requires that timely notice provisions in insurance policies be construed as covenants rather than conditions precedent.  *See Navigators Specialty Ins. Co. v. Medical Benefits Admins. of Md., Inc.*, Civ. A. No. ELH-12-2076, 2014 WL 768822, at *11-16 (D. Md. Feb. 21, 2014).  Accordingly, to the extent that Zurich American contends that it is entitled to summary judgment because § 19-110 does not apply in this case, its motion will be denied.  In light of this ruling, the only remaining issue for this Court's determination is whether Zurich American suffered any prejudice due to Brasher Design's belated disclosure of the Zokaites Complaint under § 19-110.

## V.  Prejudice to Zurich American due to Late Notification of Zokaites Complaint

Both parties have raised numerous arguments addressing the prejudice issue.  In the way of a brief summary, Zurich American asserts that the late notice of the Zokaites Complaint damaged Zurich American's ability to present a credible defense to the claims raised in that suit.  Zurich American specifically asserts that the proximate cause of McDowell Building's damages was the Reznick Firm but that McDowell Building settled its claims against the Reznick Firm with a full release of liability before notifying Zurich of the nature of the Zokaites Complaint.  On the other hand, McDowell Building asserts that Zurich American has failed to demonstrate any tangible (rather than speculative) prejudice to its interests, and further contends that Zurich American waived its opportunity to raise any argument on the prejudice issue because it refused to participate in the 2009 settlement negotiations with the Reznick Firm.  Moreover, McDowell Building claims that the declaration of Mr. Smith, the former attorney for Brasher Design, demonstrates that Brasher

Design informed Zurich American of the Zokaites Complaint before the settlement with the Reznick Firm.[13]

After reviewing the parties' briefs and entertaining the parties' arguments on both the cross-motions for summary judgment and Plaintiff's Motion for Leave to File the Declaration of R. Michael Smith, Esq., it is clear that there are some factual issues precluding summary judgment on the prejudice issue.  Specifically, McDowell Building contends that Zurich American was notified of the Zokaites Complaint before the Reznick Firm claims were settled. Meanwhile, Zurich American contends that it was not so notified and that its attempts to collect additional information about the various litigations were rebuffed by Brasher Design's attorneys.  In light of this factual question, (in addition to those previously highlighted), summary judgment would be inappropriate and the parties' cross-motions will be denied with respect to the prejudice issue. -

<u>CONCLUSION</u>

For the reasons stated above, Plaintiff McDowell Building, LLC's Motion for Leave to File the Declaration of R. Michael Smith, Esq., for Consideration on Cross-Motions for Summary Judgment (ECF No. 38) is GRANTED.   Additionally, Defendant Zurich American Insurance Co.'s Motion for Summary Judgment (ECF No. 29) and Plaintiff

---

[13] McDowell Building first submitted the evidence from Mr. R. Michael Smith to the Court in its Motion for Leave to File the Declaration of R. Michael Smith, Esq., for Consideration on Cross-Motions for Summary Judgment (ECF No. 38).  Zurich American opposed this motion, arguing that Mr. Smith never expressly states the he informed Zurich American of the Zokaites Complaint before the Reznick Firm settlement.  McDowell Building attached a supplemental declaration of Mr. Smith to its Reply Brief which states that Mr. Smith did so inform Zurich American in the summer of 2009.  At the hearing, Zurich American opposed consideration of the supplemental declaration as well.  For the reasons stated on the record, the Motion for Leave to File the Declaration of R. Michael Smith (ECF No. 38) is denied; however, as explained below, this Court does not find that summary judgment is appropriate even after consideration of these declarations.

McDowell Building, LLC's Cross-Motion for Summary Judgment (ECF No. 31) are DENIED.

A separate Order follows.

Dated:        April 13, 2015                          _____/s/_____

Richard D. Bennett
United States District Judge