IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

McDOWELL BUILDING, LLC,     *

     Plaintiff,     *

        v.     *     Civil Action No. RDB-12-2876

ZURICH AMERICAN INSURANCE CO.,  *

     Defendant.     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **MEMORANDUM OPINION**

In this diversity action, Plaintiff McDowell Building, LLC ("McDowell Building") has sued Zurich American Insurance Co. ("Zurich American") for breach of an architect's malpractice insurance policy. McDowell Building alleges that it was harmed by the negligence of its architect, and that Zurich wrongfully denied coverage under that architect's malpractice insurance policy.

This Court held a three-day bench trial on April 20, 21, and 23, 2015 and has carefully considered the exhibits introduced into evidence, the testimony of the witnesses who testified in person, the written submissions of the parties, and the oral arguments of counsel. The following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure with respect to the bench trial. This Court finds that coverage in this matter is barred under the terms of the policy because the insured had subjective knowledge of facts that might give rise to a claim prior to the effective date of the policy. Alternatively, this Court finds that Zurich American properly denied coverage because Zurich American was actually prejudiced by the insured's late

1

notice of the claim to Zurich American.   Accordingly, the accompanying Order enters Judgment in favor of Defendant Zurich American Insurance Company and against Plaintiff McDowell Building, LLC.

## I.   FINDINGS OF FACT

### A. The McDowell Building Project

Plaintiff McDowell Building, LLC ("McDowell Building") is a real estate developer involved in a project known as the "McDowell Building," located in the Mt. Vernon neighborhood of Baltimore, Maryland.   McDowell Building was originally formed by D. Ronald Brasher ("Ronald Brasher" or "Mr. Brasher") and Kemp Byrnes, but by the spring of 2003, McDowell Building included the following members: D. Ronald Brasher, John Day II, John Day III, Kemp Byrnes, and Frank Zokaites.   Zokaites held a 33.33% interest in the company, while the other members each held a 16.67% share.   As part of the development plan, the members of McDowell Building hoped to obtain state and federal tax credits.[1]

On October 31, 2002, the accounting firm Reznick Fedder & Silverman (the Reznick Group) wrote a letter to one of the McDowell Building members[2] indicating that the project

---

[1] The basic framework of the Maryland tax credit program is laid out in § 5A-303 of the State Finance & Procurement Article of the Maryland Code; that statute, however, also authorizes the State to fashion implementing regulations as part of the Code of Maryland Regulations.   As explained in those regulations, an individual seeking to obtain the tax credit must go through a three-step application process.   First, the applicant must obtain a certification that the building is a "Certified Historic Structure" (Part I).   *See* COMAR 34.04.07.03.   Second, the applicant must submit plans for the rehabilitation work on the structure (Part II).   *See* COMAR 34.04.07.04.   Finally, the applicant must apply to have the work certified after the project is completed (Part III).   *See* COMAR 34.04.07.05.

At the time, the Maryland credits were worth 25% of qualified rehabilitation costs, while the Federal credits were worth 20% of rehabilitation costs.

[2] Specifically, the letter is addressed to "John Day" of Time Equities, Inc. and copied "Kemp Burns."

had received Part II approval from the Maryland Historical Trust and noting that the project

should be eligible for a tax credit provided it met the other criteria. *See* Pl.'s Ex. 1; Def.'s Ex.

20. Specifically, the letter stated:

> Per your request, we have reviewed information in our files
> regarding the availability of historic rehabilitation tax credits for
> McDowell Building project located at 339-341 North Charles
> Street. We have determined that the project has received Part II
> approval from both the Maryland Historic Trust and the
> National Park Service. The MHT approval was dated 1/19/99,
> and as such appears to be eligible for the state tax credit under
> the 2001 law providing for a 25% credit. The NPS ["National
> Park Service"] issued its approval as of May 11, 2000.
> Assuming that other program criteria are met, this project
> should be eligible to claim both federal and Maryland historic
> tax credits.

This letter was used to attract investors to fund the project, and the transaction to purchase

the property was closed on December 1, 2003.

McDowell Building hired Mr. Brasher's architectural firm, DR Brasher, Inc., d/b/a

Brasher Design, ("Brasher Design") to complete the applications necessary for obtaining the

required credits. Karen Starika, an employee of Brasher Design, was tasked with preparing

and filing the applications.[3] Mr. Brasher testified that he signed both applications and that

he subsequently had discussions with employees at the Maryland Historical Trust about the

project.

By September 23, 2004, Brasher Design had discovered that the Maryland Historical

Trust had no application for the McDowell Building project on file. *See* Pl.'s Ex. 3; Def.'s

---

[3] The application for the federal tax credit was essentially identical to the state application, although the letterhead was different. The Maryland Historical Trust oversaw the state program, but it also initially processed the federal application as well at the time in question.

Ex. 4. The Maryland Historical Trust further declared that it was now too late for McDowell Building to apply for the tax credit. Ronald Brasher contends that, at that time, his firm conducted an investigation and concluded that the applications had been submitted and that he and his firm had made no error. Ronald Brasher did not immediately inform the other McDowell Building members of the issue, but instead engaged in discussions with the Maryland Historical Trust in the hopes of resolving the problem.

Specifically, Ron Brasher and Brasher Design contacted various state officials in the fall of 2004. On October 13, 2004, Brasher Design sent emails to Mr. Day and Mr. Sams at the Maryland Historical Trust on October 13, 2004 and October 28, 2004 in an effort to resolve the state tax credit issue. Def.'s Exs. 5 & 6. On November 4, 2004, Brasher Design sent a letter to Mr. Day at the Maryland Historical Trust requesting a meeting with him and his legal representative to address the state tax credit issue. Def.'s Ex. 7. Additionally, on November 9, 2004, Brasher Design sent a letter to Mr. Little at the Maryland Department of Housing and Community Development, Office of Preservation Service in its further attempts to address the state tax credit issue. Def.'s Ex. 8. On November 11, 2004, Brasher Design sent another letter to Mr. Sams. Def.'s Ex. 9. On or about November 17, 2004, Ron Brasher met with Mr. Little and other representatives of the Maryland Historical Trust in attempt to resolve the state tax credit issue, but he was unable to resolve the problem to his satisfaction. On November 22, 2004, Brasher Design sent an email to Mr. Schaefer and Ms. Jennings with the Office of the Comptroller of Maryland in a further attempt to resolve the state tax credit issue. Def.'s Ex. 10. On November 24, 2004, Brasher Design received a response from the Office of the Comptroller, but was still unable to resolve the state tax

credit issue to its satisfaction.  Def.'s Ex. 11.

By at least January 31, 2005, Ron Brasher had informed the other members of McDowell Building about the problem with the state tax credit.  After the issue was brought to the attention of the other members, there was some discussion about the next course of action.  For example, on January 31, 2005, Kemp Byrnes, one of the McDowell members, sent an email to Brasher and the other members of McDowell stating:

> There is almost $600,000 at stake and we don't want to get in a position that we have to start suing each other's insurance company.  Frank [Zokaites] is ready to send a letter to Reznick asking them to pass this matter on to their insurance company and was asking me if DR Brasher had insurance to cover the $600,000 if there was a mistake on their part.

Def.'s Ex. 12.

On May 17, 2005, Brasher sent an email to the other members that stated, in part: "[I]t was intimated to me last week by a partner that perhaps the legal bill should be born [*sic*] by me or my firm.  If this is the intent of the partnership, then fire your guns now and tell [M]r. [M]arr, see you later."  Def.'s Ex. 33.

Byrnes sent another email on May 20, 2005 to Brasher and the other members that stated, in part:

> I feel at liberty to share with you and [the entire membership] my thoughts and feelings about your inappropriate behavior and the major financial problem that you have created for the McDowell LLC. . . .
>         You did show me some signs of integrity, professionalism and maturity when you admitted to all the members that you and your firm screwed up and you personally accepted responsibility.  I was encouraged until I received a copy of your May 17, 2005 email reversing your position. . . . The bottom line is that I'm not intimidated by your arrogance, pressure to respond to paying your legal costs immediately or

> you're ready to go to battle with all the members.  I am totally
> against paying for the legal cost to correct the mistakes and
> negligence of you and your firm. . . . I would propose that we
> take your suggestion and fire our guns at the heart of the
> problem, YOU.  I would rather spend my legal money pursuing
> you and let you and your attorney try to recoup some of your
> damages from the State and Reznick.

Pl.'s Ex. 4; Def.'s Ex. 13.

Similarly, on June 6, 2005, John Day sent a letter to the other McDowell members stating, in part, that "[t]he partnership also faces other issues which will cause significant stress and possibly money to the members[,] . . . . [including] potential lawsuits between the Company, John E. Day Associates, and Brasher Design as well as possible suits between the actual individual partners."  Pl.'s Ex. 5; Def.'s Ex. 14.

### B.  Litigation Regarding the State Tax Credits

Despite these communications regarding a lawsuit, McDowell Building did not initially sue Mr. Brasher or Brasher Design.  Instead, McDowell Building brought suit against the Maryland Historical Trust on October 28, 2005 in the Circuit Court for Baltimore City, seeking a writ of mandamus and a declaratory judgment forcing the Maryland Historical Trust to process McDowell Building's state tax credit application.  The suit also sought damages from the Reznick Group for professional negligence because McDowell Building had relied on the letter from the Reznick Group in deciding to purchase the property.

On June 27, 2006, however, Frank Zokaites, an individual member of McDowell Building, filed a *pro se* cross-claim and third party complaint (the "Zokaites Complaint") against Brasher Design on behalf of himself and McDowell Building.  The Zokaites Complaint included a professional negligence claim against Brasher Design.  The state court

severed the Zokaites Complaint and stayed it pending resolution of McDowell Building's suit against the Maryland Historical Trust.

It is undisputed that Brasher Design still did not notify Zurich American of the Zokaites Complaint at this time.  Brasher Design's litigation attorney, R. Michael Smith, testified that he saw no need to notify Zurich American because he thought there were legal deficiencies with the Zokaites Complaint and because he was convinced that the state tax credit application had been filed with the Maryland Historical Trust after his conversation with Karen Starika.

### C.  Relevant Policy Language

Brasher Design[4] was covered by a series of consecutive one-year Architects and Engineers Professional Liability insurance policies from the time of initial discovery of the tax credit problem in September 2004 to the commencement of the suit against Brasher Design in June 2006.  Brasher Design's original policy with Zurich, the 2004-05 Policy, was effective July 6, 2004 to July 6, 2005, while its 2005-06 Policy was effective July 6, 2005 to July 6, 2006.  The final policy covered Brasher Design from July 6, 2008 to July 6, 2009.  The relevant terms of the 2005-06 and the 2004-05 policies are essentially identical unless otherwise noted.

The first line of the 2005-06 Policy states that "THIS POLICY PROVIDES CLAIMS-MADE AND REPORTED COVERAGE."  Pl.'s Ex. 11; Def.'s Ex. 31.  Similarly, the 2005-06 Policy defines the terms of coverage accordingly:

---

[4] Specifically, the Named Insured of the 2004-05 Policy was D.R. Brasher Architects, Inc.  An endorsement to the 2005-06 Policy changed the Named Insured to "D.R. Brasher Architects, Inc. and/or D.R. Brasher, Inc. and/or Brasher Design."

> We will pay on behalf of the "Insured" all sums in excess of the Deductible noted in Item 6, of the Declarations that you are legally obligated to pay as "Damages" because of "Claims" first made against you during the "Policy Period" and reported to us during the "Policy Period," or the Extended "Claims" Reporting Period if applicable, provided that:
>
>   A. the "Claim" arises out of an actual or alleged negligent act, error or omission with respect to "Professional Services" rendered or that should have been rendered by you or any entity for whom you are legally responsible, including your interest in joint ventures;
>
>   B. the act, error, or omission took place during the "Policy Period" or on or after the "Retroactive Date" specified in the Declarations;
>
>   C. prior to the effective date of this policy you or any 'Insured' had no knowledge of any 'claim' or circumstances, involving an act, error, or omission, which may result in a 'claim' under this policy;[5]
>
>   D. all "Claims" made against you are made during the "Policy Period"; and
>
>   E. you give prompt notice of a "Claim", but not later than 60 days after expiration or termination of this policy, in accordance with the Notice of Claims conditions of this policy.

*Id.* The term "Claim" is defined as "any demand received by you seeking 'Damages' or 'Professional Services' and alleging liability or responsibility on your part." *Id.* Finally, the section "Claim Provisions" provides that:

> In the event of a "Claim," prompt notice containing the particulars sufficient to identify you or any "Insured" involved and reasonably obtainable information with respect to time, place and circumstances, and the names and addresses of any injured parties and of available witnesses, shall be given by or for you to us. In the event of oral notice, you agree to furnish a written notice and send us copies of all demands or legal

---

[5] This provision was added to the 2005-06 Policy by an endorsement, referred to by the parties as the Prior Claims or Circumstances Endorsement. The Endorsement replaced the language from the 2004-05 Policy, which read: "prior to the effective date of the first policy issued to you and continuously renewed by us, no principal, partner, director or officer of yours had knowledge of any circumstance that could reasonably be expected to result in a 'Claim.'"

documents as soon as possible.   Written notice must be
provided to [Zurich] no later than 60 days after the expiration
or termination of the policy.

*Id.*

### D. The Reznick Group's Crossclaim and the Notice Provided to Zurich American

On May 21, 2009, the Reznick Group filed a cross-claim against Brasher Design for indemnity and contribution.[6]   Gordon Feinblatt, the firm representing Brasher Design, contacted Zurich American by a letter dated June 29, 2009.  Def's Ex. 26. The record in this case is undisputed that this was the first time that Zurich American had received any information concerning the state tax credits question which dated back to September 23, 2004.  Included with the letter was a copy of the "Amended Cross-Claim of Reznick Group, P.C. Against DRBrasher, Inc. D/B/A Brasher Design," which attached a copy of McDowell Building's Verified Complaint for Writ of Mandamus, Declaratory Judgment and Claims for Professional Negligence.   The letter did not mention the Zokaites Complaint, nor was a copy of that pleading included in the attachments.   Zurich American assigned Michael Cecere as the claims adjuster for the Brasher Design case and sent a letter to Brasher Design requesting, *inter alia*, (1) any summons or complaints; and (2) any letters seeking or demanding money or services.  Pl.'s Ex. 13; Def.'s Ex. 25.

The precise date that Mr. Smith first spoke with Mr. Cecere appeared to be a matter of some confusion and/or dispute at trial.  Specifically, Mr. Smith suggested that the first conversation occurred on July 6, 2009.  Mr. Smith testified that he made Mr. Cecere aware of the Zokaites Complaint at this time and told him that the claims raised in the Zokaites

---

[6] This initial pleading was titled an "Amended Crossclaim" despite the fact that the Reznick Group had not previously asserted any claims against Brasher Design.

Complaint had little merit and, moreover, had been stayed pending resolution of the action against the Maryland Historical Trust.  Accordingly to Mr. Smith, Mr. Cecere said he did not need a copy of the Zokaites Complaint in response to this information.

Mr. Cecere testified, however, that they first spoke on July 16, 2009.  Mr. Cecere stated that Mr. Smith made no mention of the Zokaites Complaint, while Mr. Smith testified that he had again mentioned the pleading.

In seeking to recall the matters in question, both witnesses referred to Zurich American's file notes, which were written by Mr. Cecere.  The entry on July 6, 2015 states that Mr. Cecere "contacted the Insured contact, Mike Smith, today"; however, the notations for that day do not mention anything about a conversation and include none of the details to which Mr. Smith testified.  Pl.'s Ex. 15; Def.'s Ex. 24.  Meanwhile, the July 16 notation states that Mr. Cecere "[s]poke to Insured's [defense counsel] Mike Smith."  *Id.*

In light of all the testimony and evidence, this Court finds that Mr. Smith did not inform Mr. Cecere or Zurich American of the Zokaites Complaint on either July 6 or July 16 of 2009.  Although there is no reason to question Mr. Smith's truthfulness, his recollection of the events appears somewhat hazy while Mr. Cecere's recollection of their conversations was corroborated by his contemporaneous notes.  Moreover, it is undisputed that neither Brasher Design nor Mr. Smith provided an actual copy of the Zokaites Complaint to Zurich American during July 2009.

While the Zokaites Complaint was not specifically disclosed during the July 16, 2009 telephone call, that conversation was also notable for several of the other topics that were discussed by Mr. Smith and Mr. Cecere.  As corroborated by the file notes, Mr. Smith

advised Mr. Cecere that "this matter ha[d] been settled"; that Brasher Design would not have to make any payments; and that all defenses costs would be within Brasher Design's deductible.  Mr. Smith also indicated that he would send "releases and dismissals once executed." *Id.*

Mr. Cecere left a follow-up email for Mr. Smith in mid-August, but the two did not actually speak again until September 22, 2009.  Mr. Cecere's file notes describe the conversation as follows:

> Spoke to the Insured's counsel Mike Smith.  Mike advised that this matter is not going to be resolved.  Currently, the cross claim against the insured is stayed pending resolution of certain issues in the affirmative action.  Since the matter is not going to be resolved, I advised Mike that I would need to fully investigate coverage for this matter and sent him an email with an information request.

Def.'s Ex. 24.  Mr. Cecere followed up the call with an email, which stated that:

> As we discussed, since the cross claims and third party claims are not going to be resolved, I will need the following information to fully evaluate coverage for this matter:
> 1) Brief description of the background of this matter, status of the litigation, the claims and damages alleged, and the roles each party played in this matter;
> 2) Copy of the insured's contract for this project;
> 3) Copies of all pleadings filed against the insured – is a there [sic] anything that predates the amended cross claim?;
> 4) When was the claim first made against DR Brashier [sic] – were therer [sic] any prior complaints or attorney demand letters before the amended cross claim?

Def.'s Ex. 28.[7]  Mr. Cecere did not receive any documents in response to this request until

---

[7] McDowell Building has argued that this email and Mr. Cecere's file notes support the notion that Mr. Smith had informed Mr. Cecere of the Zokaites Complaint by this time.  The only stayed piece of the litigation was the Zokaites Complaint, so McDowell Building argues that Mr. Cecere must have been referring to that pleading.  Additionally, McDowell Building argues that Mr.

November of 2009.

On September 28, 2009, with no participation accorded to Zurich American, the other parties, including Brasher Design, entered into a settlement agreement with the Reznick Group.  Under the terms of that agreement, the Reznick Group paid $275,000 to McDowell Building and its members; the Reznick Group released its cross-claim against Brasher Design for $0; McDowell Building, its members, and Brasher Design released the Reznick Group; and all claims to which the Reznick Group was a party were dismissed with prejudice.  Neither the Reznick Group nor Brasher Design admitted any liability.   The settlement agreement was not provided to Zurich American prior to the signing of the agreement, nor was it disclosed in the days following the signing.

Accordingly, Mr. Cecere reiterated his request for documents on October 9, 2009, and Mr. Smith responded that he had delayed "because the claim may be settled."  On November 9, 2009, Mr. Smith emailed Mr. Cecere and provided an update on the case.  This email constituted the first time that Mr. Smith explicitly identified the Zokaites Complaint and discussed the claims contained therein in a written communication to Zurich American.[8]

After receiving Mr. Smith's letter, Mr. Cecere came to the determination that there was no coverage for the claims raised in the Zokaites Complaint.  Accordingly, coverage was

---

Cecere's reference to "cross claims and third party claims" must also refer to the Zokaites Complaint because that description corresponds with the title of the Zokaites Complaint pleading and not the Reznick Amended Crossclaim.  However, these references do nothing to illustrate that Mr. Smith actually mentioned that Mr. Zokaites and McDowell Building—as opposed to the Reznick Group—had asserted claims against Brasher Design.  Indeed, Mr. Cecere's September 22, 2009 email demonstrates that Mr. Cecere was not aware of any other claims against Brasher Design, as he requested copies of all pleadings filed against the insured and specifically asked if there was "anything that predates the amended cross claim."

[8] Notably, none of Brasher Design's insurance applications for the renewal policies made any mention of the Zokaites Complaint.

12

denied by letter dated February 17, 2010 on the basis of late notice and prior knowledge of the circumstances giving rise to the claim.  *See* Pl.'s Ex. 17.

### E.  Later Developments Regarding the Other Claims

McDowell Building's case against the Maryland Historical Trust proceeded to trial in September of 2010.   At the trial, the state demonstrated that Karen Starika had misrepresented her background and experience and did not possess the knowledge and experience in tax credit applications that she had claimed to have.  Accordingly, the state court found that McDowell Building had failed to carry its burden in proving that the tax credit application had in fact been filed.

On June 1, 2010, Brasher Design and McDowell Building settled the claims in the Zokaites Complaint.  Under the terms of the settlement agreement, the parties agreed that McDowell Building's loss due to Brasher Design's failure to file the application was $625,000 plus interest at the legal rate from April 2, 2005.  However, the settlement agreement also stipulated that Brasher Design would only pay McDowell Building $250,000 over the period of several years pursuant to a promissory note.  In addition, Brasher Design assigned all claims against Zurich to McDowell Building.

After the settlement between McDowell Building and Brasher Design, McDowell Building instituted suit asserting its subrogated rights against Zurich American in the Circuit Court for Baltimore City, Maryland on August 1, 2012.  Zurich American removed this case to this Court on September 26, 2012 based on diversity of citizenship under 28 U.S.C § 1332.  McDowell Building's Complaint (ECF No. 2) contained two counts.  The first count alleged a breach of contract claim premised upon a duty to indemnify, for which McDowell

Building seeks "$625,000, plus interest at the legal rate from April 2, 2005, costs, and attorney's fees." The second count alleged a breach of contract claim premised on a duty to defend, for which McDowell Building seeks "an amount greater than $25,000, plus interest, expenses, and attorney's fees."

## II.   CONCLUSIONS OF LAW

Due to this Court's previous pre-trial rulings, the issues addressed at trial have been somewhat limited in scope. Specifically, the Court must address the following issues: (1) whether Endorsement 4 to the Policy, which excludes coverage where the insured had knowledge of a prior claim or circumstance that might give rise to a claim, bars coverage in this case; (2) whether Zurich American has demonstrated sufficient prejudice to justify its denial based upon late notice of the claim; and (3) the proper amount of damages if McDowell Building succeeds on its claim.

### A. Prior Claims or Circumstances Endorsement

Zurich American first argues that coverage is barred under the Prior Claims or Circumstances Endorsement in the 2005-06 Policy. The 2005-06 Policy states the terms of coverage accordingly:

> We will pay on behalf of the "Insured" all sums in excess of the Deductible . . . that you are legally obligated to pay as "Damages" because of "Claims" . . . provided that:
>
> . . .
>
> C. prior to the effective date of this policy you or any 'Insured' had no knowledge of any 'claim' or circumstances, involving an act, error, or omission, which may result in a 'claim' under this policy;

At the summary judgment stage, this Court ruled that this provision must be interpreted to apply a subjective standard.[9]

In arguing that the Prior Claims or Circumstances Endorsement is not applicable in this case, Plaintiff McDowell Building has relied upon the testimony of Ronald Brasher.  Mr. Brasher testified that he did not believe that any claim would be filed against his firm because he believed that his firm had not made any error and because the other members of McDowell Building had assured him that only the Maryland Historical Trust and the Reznick Group would be subject to suit.

McDowell Building's position, however, overlooks Mr. Brasher's own statements in his May 17, 2005 email that was presented at trial.  Specifically, Mr. Brasher acknowledged that at least one of the other members of McDowell Building had suggested that he or his firm should pay the legal bills arising from the lost tax credit application problem, and he instructed the other members to "fire [their] guns now."  Additionally, Zurich American presented documentary evidence of communications to Mr. Brasher in early 2005 suggesting

---

[9] At the summary judgment stage, Zurich American adamantly argued that the language of the Prior Claims or Circumstances Endorsement should be interpreted to create an objective standard of knowledge, relying expressly upon several cases decided under Maryland law.  Those cases, however, were clearly distinguishable based upon their explicit use of words triggering an objective standard.  Moreover, Zurich American never argued that the Policy language was ambiguous, nor did it provide any support for an objective reading of policy language identical (or effectively similarly) to that in the endorsement presented here.

While Zurich American has not specifically moved for any type of relief pertaining to this Court's ruling on the cross-motions for summary judgment, Zurich American again argues that this Court should apply an objective standard—or at least a mixed objective and subjective standard—in its proposed Findings of Fact and Conclusions of Law.   Even if Zurich American had properly moved for relief, this Court sees no reason to reconsider its previous ruling.  The arguments now raised by Zurich American simply seek to re-litigate the interpretation issue after Zurich American originally failed to present any case involving analogous policy language.  Moreover, as detailed below, this Court finds that the Endorsement bars coverage regardless of whether a subjective or objective standard is applied.

that a lawsuit against Mr. Brasher was possible and discussing Brasher Design's insurance coverage.   In light of this evidence, Mr. Brasher's testimony that he *never* believed that a claim might be made against him or his firm is simply not credible.   Thus, regardless of McDowell Building's later decision to only pursue claims against the Maryland Historical Trust and the Reznick Group, this Court finds that Mr. Brasher and Brasher Design knew about the tax credit problem and subjectively knew that a claim might be made against them in relation to those issues.   Accordingly, Endorsement 4 of the 2005-06 Policy—the Prior Claims or Circumstances Endorsement—serves to bar coverage for the Zokaites Complaint, and Zurich American is entitled to judgment in this matter.

## B.  Actual Prejudice under § 19-110 of the Insurance Article of the Maryland Code

Although this Court has already determined that coverage is barred in this matter pursuant to the Prior Claims or Circumstances Endorsement, this Court alternatively finds that Brasher Design's late notice to Zurich American of the Zokaites Complaint provided an independent reason for denial of coverage because Zurich American was actually prejudiced by Brasher Design's actions in this case.   In its previous decisions in this case, this Court ruled that § 19-110 of the Insurance Article of the Maryland Code applied to the Policy even though the Policy purported to be a claims-made-and-reported policy.   Section 19-110 states that an insurer may only disclaim coverage on the basis of late notice "if the insurer establishes by a preponderance of the evidence that the lack of . . . notice has resulted in actual prejudice to the insurer."   Md. Code, Ins. § 19-110.

In order to establish actual prejudice, the insurer must demonstrate that the insured's actions have in a "significant way . . . precluded or hampered [the insurer] from presenting a

credible defense to the claim." *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md. 106, 128 (2001).   On the other hand, "[a]lleging only possible, theoretical, conjectural, or hypothetical prejudice is not enough to satisfy 19-110; prejudice cannot be surmised or presumed from the mere fact of delay." *Oliff-Michael v. Mut. Benefit Ins. Co.*, 262 F. Supp. 2d 602, 604 (D. Md. 2003) (quoting *Commercial Union Ins. v. Porter Hayden Co.*, 116 Md. App. 605 (1997)).

In this case, the insurer Zurich American was not initially informed of the claims contained in the Zokaites Complaint.   While Brasher Design's attorney notified Zurich American of a separate cross-claim by the Reznick Group against Brasher Design, the nature of the claims in the Zokaites Complaint were still not disclosed.   Nevertheless, Zurich American requested materials, including pleadings and summons, in the case on two separate occasions.   Before ever providing the requested materials, Mr. Brasher and Brasher Design signed a settlement agreement releasing the Reznick Group on September 28, 2009.   By releasing the Reznick Group, Brasher Design effectively forfeited any right to contribution that it might have asserted against the Reznick Group.   Thus, Brasher Design effectively foreclosed one potential avenue that Zurich American could have pursued in its defense of Brasher Design with respect to the claims in the Zokaites Complaint.   This Court finds such interference to be sufficiently "significant" hampering of Zurich American's defensive options to satisfy the actual prejudice standards under § 19-110.   *Cf. Allstate*, 363 Md. at 128.

Seeking to avoid this inevitable conclusion, McDowell Building contends that the release of the Reznick Group, standing alone, is insufficient under the actual prejudice standard.   In McDowell Building's view, Zurich American must prove that it was entitled to

indemnity or contribution as a matter of law or that a specific defense was actually forfeited in order to satisfy § 19-110's mandate.  However, the Court of Appeals of Maryland has made clear that the "actual prejudice" standard does not require the level of absolute certainty advocated by McDowell Building.  *See Allstate*, 363 Md. at 127-28 ("[W]e believe that the proper focus should be on whether the insured's wilful conduct has, *or may reasonably have*, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or for the damages awarded." (emphasis added to underlined portion)). By demonstrating a credible theory under which Zurich American could have avoided liability or minimized the damages which it was responsible for paying, Zurich American proved what is required under the actual prejudice standard.  *Cf. id.* at 129-30 ("The prejudice was not in terms of how the jury would actually have viewed this evidence, whether the jury would have found it believable or not believable, for that is purely a matter of speculation. The prejudice lies in the fact that there was a credible defense to be presented and that [the insured]'s non-cooperation precluded [the insurer] from even presenting that defense.").  Accordingly, this Court finds that Zurich American has satisfied its burden of proving actual prejudice by showing that Brasher Design released the Reznick Group before informing Zurich American of the other claims against Brasher Design.

## CONCLUSION

For the reasons stated above, by separate order, JUDGMENT will be ENTERED in favor of Defendant Zurich American Insurance Company and against Plaintiff McDowell Building, LLC.

A separate Order and Judgment follows.


Dated:        May 7, 2015                    _____/s/_____
                                             Richard D. Bennett
                                             United States District Judge